[No. H002840. Sixth Dist. Sept. 17, 1987.]

SUSANNE WILSON, as Supervisor, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
ERVIN BRANSON et al., Real Parties in Interest.

**COUNSEL**

Donald L. Clark, County Counsel, Steven M. Woodside, Assistant County Counsel, Morgan, Ruby, Teter, Schofield, Franich & Fredkin, Allen J. Ruby, Jackson, Tufts, Cole & Black, Bartlett A. Jackson, Debra S. Belaga, Remcho, Johansen & Purcell, Joseph Remcho, Roben B. Johansen and Julie M. Randolph for Petitioners.

Charles R. Reed, Reed, Elliott, Creech, Roth & McMahon, James P. Fox, District Attorney (San Mateo), Thomas F. Casey III, Chief Deputy District Attorney, Beth Labson Freeman, Deputy District Attorney, David R. Frank, County Counsel (Shasta), James A. Curtis, County Counsel (Nevada), Jeffrey Green, County Counsel (Mariposa), Denis A. Eymil, County Counsel (Kings), De Witt Clinton, County Counsel (Los Angeles), Frederick Bennett, Assistant County Counsel, Douglas J. Maloney, County Counsel (Marin), Ralph Kuchler, County Counsel (Monterey), Adrian Kuyper, County Counsel (Orange), Lee B. Elam, County Counsel (Sacramento), James L. McBride, County Counsel (Ventura), Kenneth A. Moy and Benner, Harris & Moy, as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Eileen Matteucci, McCutchen, Doyle, Brown & Emersen, John R. Reese and Sherri J. Conrad for Real Parties in Interest.

**OPINION**

**AGLIANO, P. J.—**

### PRELIMINARY STATEMENT

This is a proceeding in certiorari to review contempt adjudications against the Supervisors of Santa Clara County.

Six years ago, in March 1981, inmates of the Santa Clara County jail (plaintiffs) brought this class action as a petition for habeas corpus challenging the conditions of their confinement, and specifically seeking relief from "overcrowding and other inhumane conditions" in county jail facilities. In the instant proceeding the trial court has imposed jail sentences and fines on each of the county supervisors for having violated two orders issued in the class action.

We have concluded, for reasons we shall state, that the contempt adjudications must be annulled.

### RECORD

On June 8, 1983, the parties to the action executed a settlement agreement under which the county agreed to provide new jail facilities under court supervision, including a new main jail to be completed by approximately 1987. As ultimately approved by the court the agreement established procedures and schedules to construct these facilities as well as dispute resolution procedures in case disagreements developed among the parties. The agreement set out legal principles to guide dispute resolution. Very significantly, it recited that in exercising its authority to remedy conditions of confinement, the superior court should be guided by the principles set down in *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861]; *Hoptowit* v. *Ray* (9th Cir. 1982) 682 F.2d 1237 and *Fischer* v. *Winter* (N.D.Cal. 1983) 564 F. Supp. 281. The agreement quoted language from *Fischer* v. *Geary,* in turn citing *Hoptowit* v. *Ray,* regarding the limited role of a court in monitoring penal institutional reform litigation. Such role is limited to determining whether a constitutional violation has occurred, and fashioning a remedy doing no more and no less than correcting the particular violation.

The settlement agreement also provided, among other things, that the court would designate a "compliance officer" to oversee performance and that the compliance officer would have unrestricted access to county staff

members and employees including the right to confidential interviews. The court appointed Thomas Lonergan compliance officer.

The record shows county is presently constructing the new main jail, which is to be completed approximately January 1988 and will contain 720 single cells to house individual prisoners in isolation from one another. Also the supervisors have authorized new construction at the county's Elmwood confinement facility, providing for two new buildings referred to as M-4 and M-5, each to contain 192 maximum security single cells. No one has argued here that these facilities are inadequate, and in fact the supervisors assert when these projects are complete Santa Clara County will provide better quality and greater capacity jails in proportion to local need than any other jurisdiction.

The proceedings before us involve two specific issues: A perceived interim need for single cells to provide adequate safety and security until the new facilities can be completed, and an asserted violation by the supervisors of the provision that compliance officer Lonergan should have free communication with county employees.

The single-cell issue was the subject of two orders issued by the trial court in June and July 1986. The June order begins by describing the county's "disturbing record of non-compliance and delayed performance" in performing its assumed obligations under the settlement agreement and subsequent court orders. It accuses the supervisors of assigning a low priority to jail matters in allocating county funds. Further, according to the order, although in early 1985 there was a "clear recognition" of a "pressing need for single cells" at the jail, the county abruptly and unilaterally changed its original plans for a 200-single-cell facility to a dormitory facility, solely to reduce costs. The order states there is a "pressing need for single cells" because the dormitory setting prevents effective supervision without "enormous staffing" and in such a setting the "inmates control the cell-blocks, and the jailers at most control the corridors," resulting in bullying, intimidation, and violence. According to the trial court, a crisis now exists, which could have been avoided had the facility designed in early 1985 been built.

The order states that the court declines to order new construction because a new facility could not be constructed quickly enough to alleviate the immediate emergency. Instead, the court directs the compliance officer (previously appointed) to specify to the sheriff and the county what space in existing facilities should be converted to provide reasonable safety and security for the inmates and jailers "in terms of single, double, triple, or quadruple occupancy, and to best serve the needs of the jail as a whole."

Conversion of such facilities is directed forthwith. Sanctions for noncompliance are stated.

The July order recites the compliance officer has asked to be relieved of responsibility for making decisions resulting in specially restricted confinement of prisoners, because some inmates have filed suit against him and his immunity has not been established. Accordingly, the court shifts responsibility to the sheriff. The court directs the sheriff by August 11, 1986, to specify the number of restricted confinement cells required to "provide reasonable safety and security to inmates and jail personnel at the current population level." The county is directed to designate a responsible official to meet with the sheriff and the compliance officer to discuss the need for additional cells and to prepare a plan to make them available. The order further reads: "If the Sheriff's Specification exceeds space for 200 prisoners, the County may delay preparation of plans pending appeal of the Specification to the Court; but if the number is 200 or less, any appeal to the Court shall not be justification for delaying preparation and implementation of such plans. The County shall provide the cells as specified, . . ."

The order further says, "All of the foregoing actions shall be performed on the basis of urgency and high priority."

After the June and July orders, the county designated a representative to meet with Lonergan and the sheriff. Early in August the sheriff reported that 163 single cells were needed and 55 were available, and therefore that 108 additional single cells were required.

The single cells have not yet been provided. For several months various communications, meetings, and discussions took place among the parties. The county ultimately presented a plan that did not provide for single cells, stating in some detail why other options should, in the judgment of the supervisors, be rejected. Lonergan and counsel for plaintiffs accused the county of stalling.

Meanwhile the county public defender, Sheldon Portman, had proposed to Lonergan that more employees be added to the public defender's office as part of a "sentencing resources program" which might reduce the jail occupancy level. Portman's relationship with the supervisors had been strained; some months earlier he had sued them, in federal court, over a salary dispute. As part of the board's annual performance review of Portman, the board's chairperson, Supervisor Wilson, wrote a letter to Portman criticizing him for, among other things, writing to Lonergan about establishing the sentencing resources program without first having discussed the matter with the board. The letter in relevant part said: "The Board does not

question your obligation to respond to inquiries from an officer of the Court. However, you have an ongoing, independent obligation to communicate proactively and directly with your appointing authority on matters which may involve the establishment of new programs in your office, the expenditure of County funds, and significant changes in the delivery of County services. To imply that forwarding a carbon copy of your correspondence to Mr. Lonergan constitutes a complete fulfillment of your obligation to your appointing authority in this regard constitutes a staggering failure on your part to recognize the obligations of County Management to the Board."

The letter went on to express serious dissatisfaction with Portman's performance as public defender and stated his termination from his position was warranted. He was terminated in December 1986.

In December 1986 and January 1987, based on the declaration of counsel for the plaintiffs, the trial court issued orders to show cause regarding contempt against the county, the individual supervisors, and the county executive (Sally Reed). The show cause orders charged the citees with willful failure to provide special confinement cells as ordered in the court orders of June 17 and July 28; willful failure to designate a county representative with sufficient authority to permit a meaningful dialogue with the compliance officer and other parties; and other derelictions related to the failure to provide a plan for making restricted confinement cells available as required by the sheriff. Also the show cause orders charged the supervisors with willful violation of the provision in the parties' settlement agreement that the compliance officer may conduct confidential interviews with all county staff employees, and with willful intimidation of witnesses and interference with the court's lawful process by discharging a county employee (Portman) because he responded to the compliance officer's requests for information.

The trial court conducted a four-day evidentiary hearing. The supervisors and other county officials testified there was no feasible way, consistent with responsible planning and fiscal management, to provide interim single cells within the specified time. Testifying as an expert witness, Bill Proctor, project coordinator for new jail construction in Santa Clara County, described the Elmwood project as extremely complex, an unusually large facility located on an inadequate site. The need to keep the existing facility open and the inmates housed during construction further complicated planning. Proctor concluded Elmwood is the most complex project he has ever worked on, and it would have been a tragic mistake to proceed precipitously. He testified it would have been "extremely dangerous" to proceed with immediate construction as the court had ordered.

Following the hearing, in February 1987, the trial court made its first contempt order, exonerating Reed but holding the county and the supervisors in contempt. The court found the supervisors were guilty of willful violation of the parties' agreement to permit free communication between the compliance officer and county employees, because of the incident involving Portman. The court said the language in the letter to Portman "calling for proactive communication with the Board is verbal orification that does not conceal the real message, which is: That he shouldn't have sent the material without having discussed it with the Board." Further, the court said the supervisors did not attempt to defend by saying they had forgotten the term of the agreement requiring free communication including confidential communication; rather their defense was legitimacy of the restriction. Accordingly, the court found the restriction blatant and willful. Further, it found the matter extremely important because of the compliance officer's broad responsibilities and need to get information and recruit ideas from county employees. "The message from the Portman matter can be devastating to the compliance officer's efforts to do his job." Further, the court said, "It is essential to maintain the integrity of the settlement agreement that this damage be minimized as soon and as effectively as possible." The court then concluded that all of the supervisors except Diridon, who did not participate in the letter to Portman or the conference which preceded it, were in contempt of court on the Portman charges and each was fined $1,000 and sentenced to serve five days in the county jail. However, each supervisor was given the opportunity to purge himself or herself by adopting and circulating a resolution (1) acknowledging board error in the criticism of Portman for communication with the compliance officer and (2) proclaiming that the compliance officer has unrestricted access to county employees. Each supervisor voting for such a resolution would be considered to have purged the contempt.

With respect to the single-cell issue, the court found that although its orders called for provision of cells designated by the sheriff, the county plan did not provide any single cells; the supervisors knew of and understood the order and had the ability to comply; and therefore each was guilty of contempt. Again, each was to be fined $1,000 and serve five days in the county jail. To purge themselves of this contempt, the supervisors had to present to the court a consent order obligating them to construct for occupancy by December 1, 1987, a facility which would provide at least 96 single cells. Monetary sanctions exceeding $9 million were imposed on the county for the period of delay in providing the facility, but the court later elected not to impose the fine on the county.

The judge specified that he was holding the supervisors in contempt of court not for a flat refusal ever to build a single-cell facility, but rather for

their refusal to accelerate the construction of single cells according to the court-imposed schedule. The judge said, "And if I said that the County was denying the need for any single cells, that was in error. What I had in mind or thought I said was that the County was resisting the idea of a need for single cells on any schedule faster than the Master Plan. And as you have indicated, that if I ordered the construction of single cells, in acceleration of the Master Plan, the County would probably appeal."

All supervisors except Diridon (absent, and not involved in the Portman charges) passed a resolution on March 13 confirming the right of all county employees to confidential communication with Lonergan, and reiterating their right of unrestricted, confidential access. However, the resolution did not say the county had previously violated its agreement, but instead said "[T]his Board of Supervisors has determined to restate to all county employees that the compliance officer does have unrestricted access to them on a confidential basis or otherwise, *a policy the Board has consistently followed in the past*; . . ." (Italics added.) Reed then wrote a letter circulated to all county employees dated March 13, 1987, saying no county employee has been criticized, disciplined or terminated for communicating with Lonergan nor will this ever happen. The letter concludes by stating that it is an important part of the employee's job to cooperate fully with Lonergan.

Until the trial court entered its final contempt adjudication, the court and the parties met and communicated in further apparent efforts to resolve the single-celling issue.

Finally, on March 16, the trial court made its final contempt adjudication, imposing on the individual supervisors the same jail sentences and fines indicated at the initial contempt adjudication.

Regarding the "purge" of the Portman matter, the supervisors argued they had passed the resolution, discussed *ante,* affirming the right and obligation of all county employees freely to communicate with the compliance officer. They said they could go no further without jeopardizing their position in litigation which Portman was prosecuting against the county. However, the court regarded the resolution as inadequate because it did not acknowledge the supervisors had erred in their conduct toward Portman. These writ proceedings followed.

DISCUSSION

With respect to the single-celling issues the supervisors argue the court has violated the doctrine of separation of powers by requiring them to provide a number of single cells on a temporary basis in advance of comple-

tion of a new jail facility, even though in their judgment immediate construction of temporary facilities would be needlessly expensive and would interfere with the master plan for construction of the new jail. They also argue neither the court orders which they are found to have disobeyed nor the Constitution requires them to provide single cells. Additionally they urge the contempt judgments are void because they are based on insufficiently specific orders and further because the court delegated judicial power to the sheriff, an interested party in this litigation. Finally they contend they were entitled to a jury trial.

In response real parties in interest contend petitioners waived any separation of powers argument by entering into the settlement agreement, that the requirement the county provide single cells was clear and specific and all parties understood that obligation was imposed, and that adequate evidence supports the trial court's findings of deliberate contempts of court.

An invalid order will not support a contempt adjudication. We agree with the supervisors that the June and July 1986 orders were invalid in two respects: They impermissibly invaded the legislative function, and they impermissibly delegated judicial functions to the sheriff. We further conclude that in any event the June and July orders were not sufficiently specific to afford a basis for contempt. In light of these conclusions we need not reach the supervisors' contention that they have a right to jury trial.

■■■ Patently the June and July orders required action by the supervisors, the duly constituted legislative branch of county government. It is well established as a matter of constitutional doctrine, basic to our form of government, that the judicial branch cannot directly and prospectively require a specific legislative act.

The plaintiffs argue that this doctrine of separation of powers does not operate to invalidate the June and July orders for two reasons: Because those orders were authorized, and indeed compelled, by other constitutional provisions relevant to the rights of prisoners, and because the supervisors had, by the terms of the settlement agreement, waived the separation-of-powers argument.

It must be remembered that the settlement agreement specifically cites certain decisions, and says the court shall be guided by the principles expressed in those cases. ■■ Those decisions, in accordance with virtually all the appellate level federal precedent dealing with penal institutional reform, express a philosophy that the judicial role in monitoring institutional reform is extremely limited and is restricted to determining whether specific constitutional violations exist and fashioning narrow remedies to

correct such violations. (*Bell* v. *Wolfish, supra,* 441 U.S. 520; *Hoptowit* v. *Ray, supra,* 682 F.2d 1237; *Fischer* v. *Winter, supra,* 564 F.Supp. 281.) The precise language quoted in the settlement agreement, from the decision in *Fischer* v. *Winter* is as follows: "The recent teachings of the Supreme Court and the Ninth Circuit have stressed the limited role of federal courts in challenges by prisoners to their conditions of confinement. [¶] . . . Any needed prison reform is an executive and legislative responsibility. The function of a court is limited to determining whether a constitutional violation has occurred, and to fashioning a remedy that does no more and no less than correct that particular constitutional violation. . . ." (*Id.* at p. 298, citing *Hoptowit* v. *Ray, supra,* 682 F.2d at p. 1246.)

The federal precedent which has considered the issue of constitutional challenges to prison conditions uniformly reflects the principles of restraint articulated in the above-cited decisions.[1] The sound reasons given for cautioning trial courts not to intrude too deeply into the management of prisons include: (1) unsuitability of courts to manage and operate penal institutions (2) considerations of federalism cautioning restraint when a federal court intrudes upon the state's domain in deciding how to operate its prisons and jails. The arguments of federalism rest on considerations similar to the separation of powers argument made here. Both doctrines aim to prevent usurpation of one governmental domain by a different authority. Accordingly, the principles in the federal cases cautioning restraint in the name of federalism are also instructive here, as well as having been expressly incorporated into the parties' agreement.

■ Further, the United States Supreme Court has ruled single celling is not always constitutionally mandated by the Eighth Amendment's prohibition against cruel and unusual punishment. (*Rhodes* v. *Chapman* (1981) 452 U.S. 337 [69 L.Ed.2d 59, 101 S.Ct. 2392].)

■ It follows that the court order here to provide an immediate plan for a temporary single-celled facility rests neither on constitutional compulsion nor the parties' agreement, which specifically refers to the federal decisions counseling judicial restraint.

---

[1] See, e.g., *Ruiz* v. *Estelle* (5th Cir. 1982) 679 F.2d 1115; *Toussaint* v. *McCarthy* (9th Cir. 1986) 801 F.2d 1080; *Benjamin* v. *Malcolm* (2d Cir. 1986) 803 F.2d 46; *Union County Jail Inmates* v. *Di Buono* (3d Cir. 1983) 713 F.2d 984; *Dean* v. *Coughlin* (2d Cir. 1986) 804 F.2d 207. The decision in *Dean* v. *Coughlin* voiced these cautions: "(1) not to use a sledgehammer where a more delicate instrument will suffice, (2) not to move too quickly where it appears that the state, in the exercise of its administrative authority, will in its own way adopt reforms bringing its system into compliance with the Constitution, and (3) to give the state a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate for the purpose. [Citations.]" (804 F.2d at p. 213.)

There is no doubt that by entering into the settlement agreement the county has agreed to some judicial control[2] and monitoring of the jail situation in Santa Clara County. Even without the agreement, some judicial control would not violate the separation of powers doctrine. Plaintiffs argue that the trial judge perceived an immediate need for single celling on account of the level of violence in the Santa Clara County jail system, and that the federal decisions, such as *Rhodes* v. *Chapman, supra,* 452 U.S. 337, do not prevent a court from concluding that single cells are constitutionally compelled under some circumstances. However, neither the developed precedent nor the Constitution as interpreted by the United States Supreme Court authorizes imposing on the county, at risk of penal sanctions, so tight a rein as we have here. Given that the county has committed itself to providing adequate facilities; given that funds have been committed and construction has begun; given that earlier construction, in the opinion of the legislators bearing the fiscal responsibility here, would have been wasteful; given that there has been no interim searching judicial review of the feasibility of immediately providing single cells; given all these considerations, we cannot find record support for immediate imposition of contempt sanctions.

The supervisors also argue the contempt adjudications based on failure to provide single cells rest on an invalid delegation to the sheriff of judicial power. The actual court orders of June and July, they correctly point out, do not specify a required number of single cells. The first order does identify a "pressing need for single cells," but calls for some interim solution, pending new construction, involving conversion of existing space to "single, double, triple, or quadruple occupancy, . . . to best serve the needs of the jail . . . ." The second order shifts the responsibility for deciding what is needed from the compliance officer to the sheriff. Petitioners are being held in contempt, arguably, not for any violation of the specific court orders, but rather for disobeying the sheriff's August memorandum saying 108 additional single cells are needed. That statement of need has never been judicially reviewed.

Further, the sheriff is a party to this lawsuit, and in a very real sense is in an adverse position to the county with respect to fiscal considerations.

---

[2] This case well illustrates the problems a trial court faces when it must depart from its traditional judicial role and become the supervising agency for a large scale construction project. Here the dilemma is particularly acute because the court assumed responsibility under the very agreement that also incorporates standards of judicial restraint. Courts have imposed those restraints upon themselves because they are aware of the tension between their obligation to enforce constitutional standards and their institutional difficulties in attempting to oversee projects more suitably managed by the legislative branch. Many commentators have discussed the dilemma; see, e.g., Chayes, *The Role of the Judge in Public Law Litigation* (1976) 89 Harv.L.Rev. 1281. Here, the trial court has been given management powers over the jail construction on the one hand, and on the other been expressly limited in its exercise of those powers, leading to understandable confusion as to what its legitimate role under this agreement should be.

The California Constitution prohibits delegation of judicial power except for the performance of "subordinate judicial duties." (Cal. Const., art. VI, § 22; *Aetna Life Ins. Co.* v. *Superior Court* (1986) 182 Cal.App.3d 431, 435-436 [227 Cal.Rptr. 460]; *In re Perrone C.* (1979) 26 Cal.3d 49 [160 Cal.Rptr. 704, 603 P.2d 1300]; *In re Edgar M.* (1975) 14 Cal.3d 727 [122 Cal.Rptr. 574, 537 P.2d 406].) In *Aetna Life, supra,* the court found impermissible the delegation to a referee of power to decide a major legal issue in a case which would "probably" determine liability. (*Ibid.*) Similarly the power to make a decision with the force of a judicial injunction, for violation of which a party might be held in contempt, is likewise not delegable to a nonjudicial officer absent stipulation or agreement.

In *Aetna Life, supra,* 182 Cal.App.3d 431, the objecting party did not originally object to the referee hearing the matter in question, but later excepted to the treatment of the reference as general and the referee's findings as binding. (*Id.* at p. 436.) The court found such objection sufficient to preserve the issue, and in fact referred to the delegation of power as nonwaivable jurisdictional error. Here, similarly, the county did not originally object to the July order assigning the sheriff power to state his needs, but did object to giving his memorandum the force of a binding court order without further discussion before the court or judicial scrutiny or input. In fact, by submitting a plan that did not provide the cells the sheriff wanted, the county clearly took issue with his findings, or at least, with the feasibility of providing that number of single cells immediately, and, since the compliance officer in fear of personal liability had distanced himself from the proceeding, the county was taking the only avenue open to it for judicial review: submitting its view of the matter to the court.

Although delegation of some powers to referees, masters, or similar nonjudicial personnel, has become fairly commonplace in institutional reform litigation generally (see, e.g., Aronow, *The Special Master in School Desegregation Cases: The Evolution of Roles in the Reformation of Public Institutions Through Litigation* (1980) 7 Hastings Const.L.Q. 739; Kalodner & Fishman, Limits of Justice: Courts' Role in School Desegregation (1978); Chayes, *supra, The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281; *Perez* v. *Boston Housing Auth.* (1980) 379 Mass. 703 [400 N.E.2d 1231]), here the delegation is not to a neutral party but to the sheriff who is an actual party to the underlying lawsuit and clearly has a special stake in the outcome. Under these facts the delegation is particularly objectionable. One hardly need cite authority for the proposition that a decision-maker must be neutral and have no personal stake in the outcome of the decision. (See generally *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 271 [25 L.Ed.2d 287, 300-301, 90 S.Ct. 1011]; *Nissan Motor Corp.* v. *New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109 [202 Cal.Rptr. 1].) As the responsi-

ble party for administering the county prison system (Gov. Code, § 26605), the sheriff is clearly not a neutral party to whom judicial power in this matter can be delegated. It is one thing to give him an opportunity to state his perceived needs, quite another to give his opinion the binding force of a court order without interim judicial review.

In *Ruiz* v. *Estelle, supra,* 679 F.2d 1115, a case extensively scrutinizing institutional reform in the Texas penal system, one of the district court errors identified and corrected was broad delegation of power to a master allowing him to submit reports to the district court based on his own observations without the parties first having an opportunity to participate in a hearing before him to consider the findings. The delegation of power to the sheriff here suffers from a similar infirmity.

Also, this delegation is contrary to the dispute resolution mechanism spelled out in the parties' settlement agreement in that it makes the sheriff's specification of need self-executing and provides for no interim judicial review, whereas the agreement, discussed above, sets out detailed procedures for negotiation followed, when needed, by judicial hearing. Immediate imposition of sanctions following upon a party's unilateral statement of need violates both the parties' agreement and the requirement that a contempt citation rest on a valid court order. Violation of the agreement is relevant to the contempt issues because plaintiffs have relied primarily on that agreement rather than on constitutional principles (i.e., the 8th Amend. to the U.S. Const.) in arguing that the trial court here has the power to control petitioners' legislative discretion in the manner it has chosen.

Plaintiffs here have argued that if one examines the entire history of this litigation, it becomes clear that a need for single cells was expressed and understood since at least 1985, and that there was no doubt but that the county was obliged to provide such cells. Further, plaintiffs say, the trial court itself determined a need for at least 200 such cells when it delegated to the sheriff an authority to designate up to that number.

For one thing, this position greatly oversimplifies a complex factual picture. Under the settlement agreement the parties have arguably agreed on a need for single celling (regardless whether it may constitutionally be compelled), and therefore the issue was not really the need for single cells, or a controversy over how many such cells were needed, but rather the time frame within which they were to be built. But more fundamentally, this argument rests on a flawed premise, that a contempt citation may rest, not on a particular order, but on an order which incorporates by reference the entire history of a complicated lawsuit. This is quite simply wrong. ∎　A

most basic premise in the law of contempt is that such punishment can only rest upon clear, intentional violation of a specific, narrowly drawn order. Specificity is an essential prerequisite of a contempt citation. (E.g., *In re Coleman* (1974) 12 Cal.3d 568, 572 [116 Cal.Rptr. 381, 526 P.2d 533]; *Brunton* v. *Superior Court* (1942) 20 Cal.2d 202, 205 [124 P.2d 831]; *Sorenson* v. *Superior Court* (1969) 269 Cal.App.2d 73, 78 [74 Cal.Rptr. 597].)[3]

For example, a California decision held an injunction based on a partnership agreement could not enforce the terms of that agreement unless they appeared in the actual words of the order, because in a contempt proceeding it is the order which is enforced, not an underlying document. (*Sorenson* v. *Superior Court, supra,* 269 Cal.App.2d at p. 78.) Otherwise the order would be uncertain and ambiguous. (*Ibid.*)

Here a similar problem exists: the contempt citation seeks to enforce, not the precise court orders as written, but those orders as amplified by (1) the sheriff's statement of need for single cells and (2) the entire history of the litigation, including previous orders made by predecessors of the present trial judge which identified a need for single cells. Not only does punishment for contempt under these conditions rest upon an impermissible delegation of judicial power, but it also violates the requirement that the court order be precise and contain all the commands to be enforced, if necessary, by a contempt citation.

Our conclusion that the supervisors cannot be held in contempt for asserted violations of the June and July 1986 orders should not be understood to mean that contempt proceedings would never be appropriate in this matter. The county has committed itself by the settlement agreement to provide facilities which all parties agree will be more than adequate at least by January 1988. Should the county not honor its commitment, the trial court will have remedies at hand to cope with the situation, including the power to close a constitutionally inadequate facility. (See, e.g., *Feliciano* v. *Barcelo* (D.P.R. 1979) 497 F.Supp. 14, 36-37; *Rhem* v. *Malcolm* (2d Cir.

---

[3] A doctrine particularly well developed in the areas of labor law and copyright infringement, but applying generally to contempt convictions for violation of injunctions, establishes that before holding the citee guilty of contempt, the injunction allegedly violated must have clearly and specifically prohibited the charged conduct. (*Brunton* v. *Superior Court, supra,* 20 Cal.2d 202, 205; *Sorenson* v. *Superior Court, supra,* 269 Cal.App.2d 73, 78; *Vertex Distributing* v. *Falcon Foam Plastics, Inc.* (9th Cir. 1982) 689 F.2d 885, 889.) This rule is codified in the Federal Rules of Civil Procedure requiring an injunction to be "specific in terms" and to "describe in reasonable detail, . . . the act or acts sought to be restrained." (Fed. Rules Civ. Proc., rule 65(d), 28 U.S.C.) Because of the serious penalties flowing from violating an injunction, this rule states "an essential requirement of any order." (*Scandia Down Corp.* v. *Euroquilt, Inc.* (7th Cir. 1985) 772 F.2d 1423, 1431; see *Schmidt* v. *Lessard* (1974) 414 U.S. 473 [38 L.Ed.2d 661, 94 S.Ct. 713].)

1974) 507 F.2d 333.) Nor do we exclude contempt based on violation of valid orders.

■ With respect to the trial court's finding that their handling of the Portman matter constituted a contemptuous violation of the court-approved provision for free communication, the supervisors argue that their action did not violate the court's orders but constituted a lawful exercise of their supervisory authority over Portman, and that in any event they have adequately purged any contempt. The plaintiffs respond that substantial evidence supports the trial court's conclusions to the contrary.

Again, we agree with the supervisors.

All that we have said regarding the need for specificity in contempt matters also applies to this part of the judgment. Here, the settlement agreement (which was approved by a court order) does mandate the compliance officer's free access, on a confidential basis if desired, to county employees. The violation charged consists of reprimanding Portman for not first discussing with the board the suggestions he made to the compliance officer. Thus Lonergan's access to Portman was not impeded; and Portman was not prevented from communicating, but reprimanded after the fact. The reprimand was directed not at the communication but at the failure to discuss costly suggestions first with the responsible body. In short, the supervisor's letter reprimanding Portman is not a direct violation of the terms of the settlement agreement.

On the other hand, putting technicalities aside, the record supports the trial court's conclusion that the board's action violated the spirit of the settlement agreement to promote free, confidential communication.

But assuming, arguendo, that the court's finding of contempt was proper, we would in any event conclude that the supervisors sufficiently purged the contempt.

A review of the precedent, both state and federal, reveals that courts have only rarely and in the most egregious cases utilized the sanction of contempt for violations of their orders by members of coordinate branches of government. (See *Meredith* v. *Fair* (5th Cir. 1962) 313 F.2d 532, 534 [threatened incarceration of Governor Ross Barnett and Lieutenant Governor Paul B. Johnson, Jr., for defying desegregation orders at the University of Mississippi by blocking the university entrance to prevent enrollment of James H. Meredith, a Black student]; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899 [141 Cal.Rptr. 133, 569 P.2d 727] [county supervisors fined

$500 each for willful refusal to comply with judgment requiring payment of welfare benefits].)

Courts charged with the responsibility of guiding prison reform have wisely utilized the judicial power to encourage cooperation of the legislative and executive branches rather than confrontation, which is less likely to produce results. When in *Toussaint* v. *McCarthy* (N.D.Cal. 1984) 597 F.Supp. 1427 the district court saw fit to find the prison administrators in civil contempt of the injunction to end double celling as soon as possible, the court nevertheless declined to impose sanctions unless there were future violations, saying "The purpose of this civil contempt proceeding is not to punish but to secure future compliance with orders of court. . . . Therefore no sanctions will be imposed at this time." (*Id.* at p. 1431.) The Ninth Circuit later agreed, noting, "We also do not consider the defendants' history of noncompliance with prior orders to constitute a valid reason for this court to arrogate to itself the discretion imposed on the defendants. . . . Our purpose is not to punish defendants for their past failures, but to enforce compliance with current constitutional standards." (*Toussaint* v. *McCarthy, supra,* 801 F.2d 1080 at p. 1105.)

The trial court in the instant case, properly concerned with minimizing the damage done, ensuring that the compliance officer's future communication with county employees remain unhampered and preserving integrity of the settlement agreement, imposed two conditions as prerequisites to purging: (1) that the supervisors acknowledge error in their criticism of Portman and (2) that they proclaim the unrestricted access of the compliance officer to county employees. Unquestionably the supervisors complied with the second of these conditions, clearly informing all employees of their right, indeed, their obligation to cooperate fully with the compliance officer.

The supervisors did not expressly confess error in their treatment of Portman and thus did not directly satisfy the first condition. They explained to the court, however, that any admission of fault in their treatment of Mr. Portman might well jeopardize their position in the pending litigation brought against them by Portman. The consequence of such an admission could result in increased burdens not only on the supervisors but on county taxpayers.

Considering the circumstances and the deference due members of a coordinate branch of government we determine the supervisors' response substantially complied with the court's order permitting the supervisors the opportunity to purge the arguable contempt.

First, although the supervisor's response was not a direct acknowledgment of error, by proclaiming to all county employees their right and duty

to freely communicate with the compliance officer, the board indirectly acknowledged the wrongfulness of any prior interference. Second, insistence on a direct and express confession of error imposed an unnecessary and unreasonable Hobson's choice. Third, the supervisors ultimately manifested due respect for the court's order. Finally, the court's concern with future compliance should have been satisfied by this good faith attempt to meet its conditions.

For all of the foregoing reasons the adjudications of contempt made on March 16, 1987, upon Susanne Wilson, Zoe Lofgren, Dianne McKenna, Tom Legan, and Rodney Diridon are annulled.

Brauer, J., and Capaccioli, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied January 21, 1987. Panelli, J., did not participate therein. Broussard, J., was of the opinion that the petition should be granted.