## MYERS v. ENGLISH, STATE TREASURER.

The provisions of section fifteen of article six of the Constitution, respecting the salaries of District Judges, do not exempt those officers from the necessity of an appropriation for that purpose by the Legislature.

The power of controlling and disposing of the revenue of the State, is vested by the Constitution in the Legislature.

It is within the legitimate power of the Judiciary to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means and no power to avoid the effects of *non-action.*

The provision of the Constitution which prohibits the passage of any law impairing the obligation of contracts, relates solely to contracts between individuals, and not to contracts between individuals and the State.

APPEAL from the District Court of the Sixth Judicial District, County of Sacramento.

This was an application to the Court below for a writ of *mandamus* against the defendant, to compel him, as State Treasurer, to pay certain warrants drawn by the Comptroller, prior to the first day of January, 1857, for the payment of portions of the salaries of District Judges, accruing in 1856.

An order to show cause why the writ should not be issued, was made against the defendant. In obedience to said order, the defendant filed his answer, and alleged as cause, as follows:

1. That the warrants were issued for indebtedness which ac-

crued prior to the first day of January, 1857, and by the provi-
sions of the second section of the act of April 21, 1856, the Treas-
urer was and is prohibited from paying warrants issued for
indebtedness of the State which accrued prior to that period.

2. That no provision was made by law for the payment of
these warrants, and at the time of their issuance, the State was
indebted more than the sum of $300,000, and that the debts of
plaintiff were not within the exceptions of the Constitution of
this State.    There was money in the treasury applicable to the
payment of the warrants.

The Court below refused to grant the *mandamus*, and the plain-
tiff appealed to this Court.

*W. S. Long* for Appellant.

Was the Treasurer bound to pay these warrants when they
were presented to him?    The Court's attention is respectfully
called to the fact, that nearly every one of these warrants were
drawn for the payment of the Judges' salaries.    The office of
Judge is not established simply by act of the Legislature, but
the Constitution itself has established it, and it will not certainly
be contended that when the framers of our Constitution estab-
lished these offices, that they intended the Judges to perform the
important, responsible, and laborious duties of their offices with-
out pay.    And no one will contend that the office of Judge would
be filled at all, if there was no pay attached to it.    The Legisla-
ture certainly could not, by any act that it could pass, abolish
the offices of Judges of the Supreme Court or District Judges.
Yet it is contended that the Legislature can refuse to pay the
Judges anything for their services, and thus do that indirectly,
which they can not do directly.    For who supposes the Judges
in the State would hold their offices without some compensation
for their services.    They would be forced to quit the bench—no
Courts would be held in the State, and the wheels of the entire
government would at once be stopped.    Has the Legislature the
power to pass any act, the operation of which will bring about
such results?    We say they have not, and therefore that the act
of the Legislature, prohibiting the Treasurer from paying these
warrants, is unconstitutional and void.

The money was in the treasury at the time these warrants
were drawn; it had been collected from the people, and was paid
into the treasury by them expressly for the purposes of paying
the expenses of the government, and the Legislature had no
right to keep it in the vaults, but were bound to appropriate and
have it paid to those to whom it belongs.    And the Legislature
did, on the fifteenth day of March, 1856, pass an act making an
appropriation for the payment of these warrants.    See Statutes
of 1856, p. 45.

This Court has already said, in the case of Laforge *v.* McGee,

that when the money is in the treasury, the holder of the warrants has a lien on it, and the Legislature has no right or power to take it from him.  Yet it is contended in this case, notwithstanding the money was in the treasury, and that it had been appropriated to the payment of our warrants; that the Legislature can afterwards pass an act preventing us from receiving the money and compelling us to take bonds instead.

We contend that the act to fund the indebtedness of the State, passed April 19, 1857, is unconstitutional and void for another reason, to wit:  Because it authorizes the issue of State bonds, when the State is already in debt above her constitutional limit; therefore, no act of the Legislature could authorize the Treasurer or any one else to issue the State's bonds for any sum whatever.   If we are correct in this proposition, then the general appropriation stands in full force, and the money being in the treasury at the time our warrants were presented for payment, the Treasurer was bound to pay them.   But it is said the issuing of our warrants was illegal, because it was creating an indebtedness against this State.   The simple answer to this is, that the money was in the treasury for the payment of the warrants at the time that it was drawn, and, therefore, it was making no debt against the State.    The Comptroller's warrant is simply the authority for the Treasurer to pay the money, and certainly does not become a debt or liability against the State until the payment is refused.

*Heydenfeldt* made similar points on behalf of Appellant.

*Volney E. Howard* filed the following brief on the part of the Appellant.

1. The fifteenth section of the sixth article of the Constitution provides that "the Judges of the Supreme and District Courts, shall severally, during their continuance in office, receive for their services a compensation, to be paid out of the treasury," etc.  Wood's Digest, 34.  This section was intended to make the Judges preferred creditors, for the wise purpose of securing their independence in office.  They are to be paid out of the treasury during the period of their office.  They are also to be paid at stated times, a compensation, which can not be increased or diminished during their respective terms of office.   The amount of the salary, and the terms of payment existing by statute at the time of the election, become parts of the contract between the State and the officer; and the Legislature have no more right to say that the Judge shall be paid at different periods, in something else than cash, than to reduce the amount of the salary.   Any provision that retards or accelerates the period of performance, impairs the obligation of the contract.   Story on the Constitution, 250, *et seq*.   That the law existing at the time

of the contract, enters into and becomes a part of it, is a principle firmly established. McCracken v. Haywood, 2 How., 612.

2. The office being created by the fundamental law, and the amount of salary and time of payment fixed by the statute, the Constitution makes the appropriation as soon as the money comes into the treasury. The words "shall receive," have been held an appropriation. Thomas v. Owens, 4 Maryland, 189.

3. There was a specific appropriation for the payment of the salaries covered by these warrants. The act of March 15, 1856, appropriates $50,000 for the salaries of the District Judges. The act of April, 1857, appropriates $25,000. And the act for the fiscal year of 1858, appropriates $55,000. We submit that the Legislature had no power to divert the fund which, by force of the appropriation, had thus become the money and property of the officer who had earned the salary.

4. It is said that the Treasurer is justified in refusing to pay these warrants, because the Funding Act postpones all creditors, and requires them to receive bonds, etc. In the first place, it is submitted that the warrants do not come within the act, because the case admits funds in the treasury liable to and sufficient for their payment. That of April 21, 1856, applies to the warrant only, "if there should be no funds or money in the treasury applicable to the payment of the same." We say, therefore, the Treasurer has refused payment in his own wrong, by refusing to apply a fund specifically appropriated.

That this application is not a suit against the State, but a proceeding against the officer to compel him to perform a ministerial duty enjoined by the law.

We submit that the act of April 21, 1856, does not specifically include the Judges of the District Court, and that an act will never be so construed as to impair the obligation of a contract, or divest a vested right. Thorne v. San Francisco, 4 Cal., 127.

5. Again, if the Legislature had intended to include the Judges, the act would have been void, as impairing the obligation of the contract. And that this inhibition of the Federal and State Constitutions, applies as well to contracts of States as of individuals. That the leading cases arose on contracts of States. Fletcher v. Peck, 6 Cranch, 87 ; New Jersey v. Wilson, 7 ib., 164 ; Green v. Diddle, 8 Wheaton ; Dartmouth College v. Woodam, 4 ib.

The amount involved in this case is not large, but it must determine whether the Legislature shall have the power to control the judiciary, by compelling the Judges to receive anything else than gold and silver; and instead of being paid during the term of office, to receive paper payable ten years after the term. The construction contended for by the Treasurer would destroy the value of the provisions thrown around the judiciary by the Constitution, and place the Judges in a condition of dependence upon the legislative departments.

*Jas. L. English,* Respondent, in person.

I hardly know what to say on behalf of the respondent, further than is contained in my answer in the case.

1. It is admitted that the warrants mentioned in plaintiff's complaint, were all issued for indebtedness which accrued prior to January 1, 1857, and that being the case, the Treasurer is expressly prohibited by the second section of the Act of April 21, 1856, from paying them.   See Acts of 1856, p. 230, § 2.

The appellant says, however, that this act is unconstitutional, because it makes that a debt, which was not a debt before. What he means by this, I do not know, unless he means to imply that the issuance of the Comptroller's warrant is the creation of a debt—but in this he is simply mistaken, for the debt was contracted before, and the Comptroller's warrant is simply the means by which payment is obtained of a debt previously contracted.   It is plain, then, that the act does not make that a debt, which was not a debt before.   And the appellant being mistaken in his premises his conclusion inevitably falls.   The act is constitutional, for the Legislature unquestionably possesses the power to direct the disposition of the moneys of the State.

2. It is admitted that at the time of the issuance of the warrants the State was indebted more than $300,000, and that none of the warrants were issued for indebtedness within the exceptions of the Constitution.

This being the case, if no provision is made by law for their payment, as I allege, they cannot be paid.   The appellant shows no provision of law for their payment, whilst, on the contrary, I show an express provision that they shall not be paid.   And here I would especially call the attention of the Court to the fact that the warrants mentioned in the complaint, were drawn months after the passage of the Act of April 21, 1856, by which it was proved that no such warrants should be paid.

3. I refused to pay the warrants because there was in the treasury no money legally applicable to the payment of those warrants.

The plaintiff below proved that there was in the treasury in general fund, about $165,000, on the fifteenth day of March, 1856, and that enough of this money to pay his warrants, remained in the treasury on the third of January, 1857, when payment of the warrants was demanded and refused.

I say that none of this money was legally applicable to the payment of these warrants, because of the prohibition contained in the second section of the act of April 21, 1856, already cited.

The appellant however contends that because the Legislature made an appropriation against which these warrants were drawn, he is entitled to be paid.   But if that gives him a right to be paid, then each of the $500,000 of warrants still outstanding must be also paid, for they are all drawn against appropriations.

Indeed, the Constitution of the State provides, that "no money shall be drawn from the treasury, but in consequence of appropriations made by law." Constitution of State, Art. 4, § 23.

The appellant appears to entertain the erroneous impression which generally prevails, that an appropriation is a setting apart of so much money in the treasury, to pay certain debts, whereas, the appropriations are almost always made when there is not a dollar in the treasury to meet them. So that the fact that the warrants are drawn against an appropriation, gives them no right to be paid.

The appellant, however, contends that, because there was $165,000 in the treasury at the time of the appropriation, against which his warrants were drawn, (the total appropriation amounted to $604,000,) and money enough to pay his warrants at the time they were drawn, therefore he has a lien upon the money. What gives him a lien? What gives him a preference over the holders of the five hundred thousand dollars of Comptroller's warrants still outstanding? He has no lien; he is entitled to no preference. They are all upon an equality.

[This case was originally argued and decided at the January Term, 1858, and the following opinion was delivered at the April Term, on a re-hearing. The first opinion is not given, for the reason that the present decision covers all the points determined in the former, and the points raised are more elaborately discussed. Both opinions were rendered by the same Judges.

REPORTER.]

BURNETT, J., delivered the opinion of the Court—TERRY, C. J., concurring.

This case was decided at the January Term, and on account of the great importance of the principle involved, a re-argument was had, and the subject ably discussed by the learned counsel for the plaintiff.

The fifteenth section of the sixth article of the Constitution of this State provides that the Judges of the Supreme and District Courts shall, severally, at stated times during their continuance in office, receive for their services a compensation, to be paid out of the treasury, which shall not be increased or diminished during the time for which they shall have been elected.

It is insisted by the learned counsel for the plaintiff that this provision of the Constitution, taken in connection with the statute fixing, in advance, the amount of the salary of a Judge, and the stated times at which that salary shall be paid, is, in fact, an appropriation of so much money in the treasury for that purpose; and that, therefore, no further appropriation is required by act of the Legislature, nor can that body defeat the payment

of the prior appropriation made by the Constitution, so long as there is any money coming into the treasury.

The twenty-first section of the fifth article contains the same provision, in reference to the salaries of the Governor and other officers of the Executive department, except that it is not stated in so many words, that the salaries shall be paid out of the treasury. The twenty-fourth section of the fourth article provides that: "The members of the Legislature shall receive for their services a compensation, to be fixed by law, and paid out of the public treasury; but no increase of the compensation shall take effect during the term for which the members of either house shall have been elected.

The only difference between this clause and those relating to the compensation of the Judges and executive officers, is, that the compensation of members of the Legislature cannot be *increased*, while it may be *diminished*, during the term. But this difference cannot constitute any distinction in these provisions, in reference to the question of prior constitutional appropriation. We can see no difference in the principle involved. If the Constitution, taken in connection with the statute fixing the amount of the salary of a Judge, and the stated times at which it must be paid, makes the appropriation for the payment of the salary, then it does the same thing for the compensation of the officers of the executive department, and of members of the Legislature. The provision of the Constitution is substantially the same in reference to these classes of officers. The amount of the compensation is fixed by prior law, and unchangeable, by subsequent act, (except as before stated,) in all the cases; and the fact of appropriation, by the Constitution itself, must exist as to all, or none. It is true that the provision in reference to the compensation of the executive officers does not state that the same shall be "paid out of the treasury;" but this is the palpable meaning, and this omission is fully supplied by other provisions of the Constitution.

If these views be correct, and there is no substantial difference in the cases stated, and the appropriation by the Constitution, if it exist at all, applies to all, or none, then it follows that no legislative appropriation would be necessary for much the larger portion of the ordinary and regular State expenses. That provision of the Constitution which says no money shall be drawn from the treasury but in consequence of appropriations made by law, would then be comparatively useless.

But if the position contended for by the able counsel of plaintiff be true, then it would, in principle, equally apply to other cases. As for example: where an office is created by the Legislature, and the salary fixed at a specific sum, payable at stated times, no subsequent appropriation by the Legislature would be required, so long as the law creating the office remains un-

changed. The legislative will, having been already constitutionally expressed, that the office shall exist, that the officer shall be paid a given sum at stated times, what use could there be in making any express appropriation, in *this* case, if such appropriation can be dispensed with in *any* case? An act of the Legislature, passed in pursuance of the Constitution, is as much the will of the people as a constitutional provision itself. The only difference between the two cases is, that they are *changeable* in different *modes;* but so long as they remain unchanged, they are equally the expressions of the public will, in the contemplation of our theory.

But if we concede the principle contended for to be true, for the sake of the argument only, then it presents very serious difficulties in reference to its practical application. It must be evident that if we could suppose that the legislative department should be so partial and unjust as to withhold the necessary appropriations for the judiciary, while the *other* officers of the State were paid their fixed salaries, it could only be upon the ground of hostility to this department, and a desire to bend its decisions to the views of the Legislature. If that body desired to accomplish this end, it would not seek to do this by withholding the pay of District Judges, but would withhold the appropriation for the salaries of members of this Court. In such a case, how could we enforce our demands upon the State Treasurer? We could not decide in our own cases, and the Constitution has made no provision for the appointment of special Justices. If, on the other hand, the Judges were placed on an equality with the other officers of the Government, and the same appropriations made as to all, then there could be no just complaint, on the ground of partiality or prejudice. So long as we are all placed upon an equal footing we must be content. And to suppose that the Legislature would make so partial and unfair a distinction against this department, and in violation of its plain duty, is to suppose that which has happened but seldom in the history of our country.

The learned counsel for the plaintiff has referred us to the decision of the Court of Appeals of the State of Maryland, in the case of Thomas *v.* Owen, (4 Maryland R., 190.)

The Constitution of Maryland specified the amount of the annual salary of the officer; and there is, therefore, this difference between the two cases. But we think it must be conceded that the decision is a case in point, and sustains, fully, the position taken, notwithstanding this difference. The principle involved is the same. The decision of the Court upon this point was unanimous, all the four Judges concurring.

The Chief Justice, in delivering the opinion of the Court, says:

"An opposite interpretation would countenance this paradox,

Myers v. English.

that a co-ordinate branch ef the government could stop its whole machinery by refusing to pay the salaries of those upon whom is devolved the discharge of the duties of the other branches."

It is very true that the Legislature possesses the power to stop the whole machinery of government, whenever it is willing to take the responsibility of doing so. That body might repeal all the existing laws, and leave the people of the State practically without government for a time. So the Legislature, under the Constitution of this State, at one session, can fix the compensation of members at the succeeding session; and this compensation, though merely nominal, cannot be increased by the incoming Legislature. The Legislature has the power to repeal all existing revenue laws, and thus leave the State treasury without funds. The Legislature has also the power of taxation to the extent of the value of all the property in the State.

But, with all due deference to the learned and distinguished jurists who decided the case of Thomas v. Owen, we are compelled to arrive at a different conclusion. We think the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature. It is a very delieate and responsible trust, and if not used properly by the Legislature at one session, the people will be certain to send to the next more discreet and faithful servants.

It is within the legitimate power of the judiciary, to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of *non-action*. The Legislature being the creative element in the system, its action cannot be quickened by the other departments. Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation. There may arise exigencies, in the progress of human affairs, when the first moneys in the treasury would be required for more pressing emergencies, and when it would be absolutely necessary to delay the ordinary appropaiations for salaries. We must trust to the good faith and integrity of all the departments. Power must be placed somewhere, and confidence reposed in some one.

The learned counsel for the plaintiff insists that we erred in the former opinion, in saying, "That provision of the State Constitution which prohibits the passage of any law impairing the obligation of contracts, relates solely to contracts between *individuals*, not to contracts between individuals and the State."

The learned counsel has referred us to several leading cases, and among them to the case of Fletcher v. Peck, (6 Cranch, 87.) The decision of the Supreme Court of the United States, upon a constitutional point, is binding and conclusive upon this Court.

23

But while this is true, the reason given for the decision we are at liberty to doubt.

In that case, Chief Justice Marshall says :

"The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to re-assert that right. A party is, therefore, always estopped by his own grant."

With the utmost deference for the opinion of the distinguished jurist, I am compelled to doubt whether he placed the decision upon the proper ground. I concede that a grant is an executed contract; but, with due respect, I submit that it has no existing *obligation* to be impaired. It has accomplished all that the parties intended, and therefore the obligation has ceased. The obligation of an executed contract is an element that *was*, and *is* not. The executed grant accomplished two *finished* purposes.

1. The extinguishment of the title of the grantor.

2. The vesting of the title in the grantee. These two purposes being accomplished, the grantor has no more right to the thing granted, than he has to other property, to which he *never* had any title. But this want of *present* right does not arise from the *estoppel* of the grant, but because the *title in fact passed* from the grantor to the grantee. The title, by the grant, was extinguished in one, and vested in the other party. "An estoppel," says Lord Coke, "is when a man is concluded by his own act or acceptance, to say the *truth*." And when A conveys land to B by a *valid* conveyance, he is not allowed to reclaim the estate because he is estopped, but because he has no *existing title* to it. Estoppels being odious, because they will not permit a man to speak the truth, the law will not base a conclusion upon that ground, when it can find a sufficient ground that is consistent with the truth. The distinguished Chief Justice says, very truly :

"Conveyances have been made; those conveyances have vested legal estates, and, if these estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact."

Now, I can see no difference, in principle, between the right of the State to seize property she has once validly conveyed, and her right to seize property to which she *never* had any title. The question is as to her *existing* title, not as to the title she once had. If she has no existing title, then the seizure is a pure violation of vested rights ;· and whether those rights became vested by her act or by the act of another, they are equally vested and equally protected, because they are vested rights. A man may have a vested interest in property that he never acquired by an executed contract; and still he is protected as well as if he had so

acquired it. I cannot see why the Legislature should be prohibited from taking the property of an individual because he purchased of the State, while the property of another individual is not thus exempt, because he acquired it by his own labor. And if the latter is protected by the Constitution, it must be upon a principle equally applicable to the first; that is, upon the ground of *vested right*, and not upon the ground that the obligation of the contract would be impaired.

Under the views we take we still adhere to the position stated in the former opinion. That provision of the Constitution refers to contracts between individuals. It could not refer to contracts between individuals and the State, because the State cannot be sued. The provision is general, and must embrace *executory* contracts; and, therefore, if it was intended to apply to the State at all, it must have embraced those contracts that have obligations to be impaired.

We must adhere to our former decision.

Judgment affirmed.