[No. D022160. Fourth Dist., Div. One. Apr. 14, 1995.]

BOARD OF SUPERVISORS OF SAN DIEGO COUNTY et al.,
Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
MANUEL ARMSTRONG et al., Real Parties in Interest.

**COUNSEL**

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Nathan C. Northup, Deputy County Counsel, for Petitioners.

No appearance for Respondent.

Jordan C. Budd, Alex Landon, Barwick, Rutherford & Scott, Charles Scott, Gregory E. Knoll and Anson B. Levitan for Real Parties in Interest.

**OPINION**

HUFFMAN, J.—In these proceedings, the members of the San Diego County Board of Supervisors seek a writ of review directing the respondent

superior court to vacate its order issued August 29, 1994, adjudging the board members to be in contempt of court and imposing fines for willful disobedience of a consent decree arising out of a jail crowding lawsuit.[1] The trial court also held in contempt the Sheriff of San Diego County for the same violation of the consent decree and order: continuing violation of the court-ordered population cap at the Las Colinas Detention Facility for Women (LCDF).[2] The sheriff has not joined the Board as a petitioner for writ of review in this court.

The Board challenges the contempt order, claiming it represents an excess of jurisdiction by the trial court in (1) interpreting the terms of the underlying consent decree and (2) invading the Board's legislative discretion in the allocation of public funds. Procedural attacks on the findings and evidence presented at the hearing are also made.

Strictly construing the contempt order and proceedings (*In re Liu* (1969) 273 Cal.App.2d 135, 142 [78 Cal.Rptr. 85]), we conclude that the contempt adjudication against the Board must be annulled when the requirements of the consent decree (i.e., that the Board, on behalf of the County, and the sheriff "will not operate" certain detention facilities with prisoner populations in excess of the established operational capacities) are properly construed. Statutory law and the separation of powers doctrine require us to draw a distinction between the Board's obligation to provide reasonably adequate funding for jail operations and the sheriff's duty to operate the facilities within the terms of the consent decree. We vacate the order finding contempt and imposing fines upon the Board, while leaving in place the order as to the nonpetitioner sheriff.

## THE RECORD

The 1988 consent decree represents a settlement of the 1987 Armstrong class action against the Board and the sheriff, brought by present and future

---

[1] The individual members of the board of supervisors and petitioners herein are Brian P. Bilbray, Dianne Jacob, Pam Slater, Leon L. Williams, and John MacDonald (collectively, the Board). Since the November 1994 elections, the membership of the Board has changed; our review is confined to the time period before the order was issued.

The jail crowding lawsuit which gave rise to the consent decree which the trial court sought to enforce in these contempt proceedings was Armstrong v. Board of Supervisors (Super. Ct. San Diego County, 1987, No. 588349) (Armstrong), consolidated with Hudler v. Duffy (Super. Ct. San Diego County, 1977, No. 404148) (Hudler).

Where appropriate, we shall refer in this opinion to the County of San Diego as the County.

[2] At the time the order of contempt was issued, Jim Roache was the Sheriff of San Diego County. William Kolender became Roache's successor in office after the November 1994 election, and is not yet a party to this action. We review the contempt proceedings with reference to the participants during the time period leading up to the August 1994 order.

inmates of five particular detention facilities, including the LCDF.[3] The consent decree established a cap for the inmate populations at the subject detention facilities, and gave the superior court jurisdiction to monitor the inmate population at the facilities subject to its terms and to resolve disputes between the parties. In pertinent part, the consent decree provides that after July 1, 1990, "the County and the Sheriff of San Diego County will not operate these detention facilities with prisoner populations in excess of the established facility-wide operational capacities as set forth" in the prior portion of the agreement. The LCDF cap was set at 478 prisoners. The decree further provides that the County and the sheriff will not operate these detention facilities with prisoners sleeping with their mattresses on the floor.

The consent decree specifically exempted future facilities from its provisions, and stated that under the decree, the Board and the sheriff undertook no obligation to build new facilities, expand existing facilities, or operate other facilities. The consent decree provides that its provisions shall be modified only by the written agreement of the parties and approval of the superior court, subject to a provision for meeting and conferring if the agreement caused undue hardship or if an ambiguous interpretation were possible. On December 1, 1988, the superior court adopted the consent decree as the order settling the Armstrong litigation.

In 1989 the Board caused to be constructed adjacent to LCDF an interim detention facility for male inmates, called the Las Colinas Men's Detention Facility (the men's facility), pending completion of a permanent detention facility. This court in *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1450-1455 [263 Cal.Rptr. 340], reviewed the adequacy of the environmental impact report prepared regarding the men's facility and acknowledged that that facility was intended as an interim operation with an approximate seven-year existence. The men's facility consisted of modular housing units and, while it was operational, it had its own security staff, kitchen and dining equipment, medical unit, and visiting and transportation facilities.

In April 1993 the County opened a permanent facility, the George Bailey Detention Facility for Men, and closed the men's facility. Staff, equipment, and inmates were moved from the men's facility to the Bailey facility. This decision to consolidate some existing jail operations at the new detention facilities was made under fiscal pressure beginning in 1992 when the State

---

[3]The other facilities covered by the consent decree were the El Cajon, South Bay, Vista, and Descanso detention facilities. In the decree, the Armstrong action was consolidated with the Hudler action, which dealt with the central jail. (See fn. 1, *ante*.)

of California unilaterally shifted property taxes away from the counties in order to meet state budget needs. The property tax shift was repeated the following year, and both years it created critical budget shortages for the County.

In June 1993 the inmate population at LCDF began consistently to exceed the consent decree population cap of 478. The plaintiffs in the Armstrong matter, the real parties in interest in these writ proceedings, applied in February 1994 for an order to show cause re contempt for failure to meet the population cap at the LCDF. The order to show cause was issued, opposition was filed, and evidentiary hearings occurred over the course of several weeks. Testimony was taken from Supervisor Bilbray, Sheriff Roache, and a number of other county financial and sheriff's officials, as well as expert witnesses for the Armstrong plaintiffs.

At the first evidentiary hearing, the Armstrong plaintiffs called Sheriff Roache as an adverse witness. (Evid. Code, § 776.) The court requested that the sheriff comment upon the statement in the Board's brief that "the Sheriff has all the funds needed to comply with the Consent Decree by transferring those resources already allocated to him in his budget. The Sheriff also has the authority via prior orders of this court to reduce the population at Las Colinas to its agreed cap." The sheriff responded:

"That's a—the statement on its face is true, but it does not deal with the practical realities of providing public safety services to this entire county of San Diego. Not only am I responsible for, and the men and women of this organization responsible for operating a very large, stressed jail system, that is in facilities that are antiquated, have not been well-maintained, and are essentially crumbling around our feet at a population level that exceeds our staffing capability to handle, but I also have the responsibility to provide for other law enforcement services: Patrol, investigations, communications and other things.

"And while the ability exists for me to reduce public safety services directly available to the community, in terms of patrol or communications or homicide or vice or any other activities, and transfer those personnel and resources to jail operations in order to come up with sufficient personnel and money to expand our capacity, it will—I can do so, but at the cost of jeopardizing the taxpayers' safety.

"And I have to balance a number of interests here; try to meet all those interests as best I can with the resources available.

"We have done that. We have trimmed administrative fat. We have scaled down validly needed, important law enforcement operations to the bare

bones, and, in fact, below bare bones level in order to try to balance budgets and live within the allocations available.

"My personnel have done a Herculean task both in law enforcement services and jail, and they are being asked to do more and more and more with less and less and less. And it has got to the point where I cannot in good conscience transfer resources and personnel from other operational areas to the jail and jeopardize public safety in those other areas."

In a later stage of the hearing, the sheriff made a similar comment:

"It is frequently said, I recall, I believe, Supervisor Bilbray indicating, well, the Sheriff has the discretion, the authority to transfer personnel or transfer funds from other existing operations and augment the staffing and the resources available at Las Colinas.

*"Technically, that is correct. Realistically, pragmatically, it is impossible to do.* Because it would place me into a position where I would have to decide, knowingly, that I would move money and personnel and staff from other facilities that are already below minimum staffing that are just barely able to keep afloat and maintain some reasonable—well, I'll—I misstated it— unreasonable level of supervision and security, move them to Las Colinas to solve the existing problem and further intensify the problem at some other facility.

"It's—essentially, I find myself in a position where there is no fat somewhere else, there are no excess personnel or resources available in other locations at the department. And that if I move personnel or resources from some other operation, I've just created another disaster somewhere else." (Italics added.)

Throughout the evidentiary hearings, various witnesses were asked about the possibility of reopening the closed men's facility to house female inmates there to relieve the crowding at LCDF. For example, Supervisor Bilbray stated that in connection with such a proposed budget item, "there was discussion about the ability to function within the existing—being able to realign existing resources to be able to address those situations." Supervisor Bilbray gave his opinion that the Board had given the sheriff sufficient money to operate jails within the cap, based on the budgetary process which showed there were a lot of expenditures being made now that could be redirected by the sheriff. He stated the sheriff had recently received the largest increase in his budget in the history of the County, and that resources within the sheriff's department could be mustered to address the jail aspects

of the problem. When asked whether the Board had provided the sheriff with the amount of funds necessary to operate the jails, as well as perform the other functions required of him, Supervisor Bilbray responded: "I think he can do the job; though, it's extremely tough." He then stated that he did not think the sheriff had misspent any of the money, although he might have made different funding decisions.

David Janssen, chief administrative officer for the County, submitted a declaration stating that the sheriff's budget had been increased over the past several years, although general revenues to the County had decreased by 10.2 percent in the past two fiscal years. Thus, in terms of the County's discretionary revenues, the sheriff's share has increased from an average of 16.5 percent to 17 percent during the 1980's to over 21 percent in the 1993-1994 fiscal year. The declaration also gave details about the County's funding situation, including the shift of local property tax revenues to the state treasury to offset the state's budget problems, and the "Teeter Plan," a bill which provided one-time savings to counties that wished to implement an alternative method of apportionment of delinquent taxes, which would result in the County receiving one-time funds of $70.5 million as a result of its participation in the plan in the 1993-1994 fiscal year. The County's policy was to spend such one-time funds on one-time projects with long-term benefits, rather than ongoing expenses such as staffing allotments. Janssen estimated that the County would have a shortfall of $31.4 million for the fiscal year of 1994-1995, and would have to cut programs and services. With respect to the question of whether the Board had given the sheriff enough money to comply with the jail population caps, Janssen testified:

"To the extent that Las Colinas—the operation of Las Colinas [LCDF] requires the expenditure of overtime moneys—and I presume it does—the County has paid for that, and they paid for it above and beyond the Sheriff's budget.

"The Sheriff's budget this year is approximately $157 million. It's been adjusted to 159. He's spending 160. Now, we obviously will have to decide at the appropriate time whether or not to bail the Sheriff out, if you will, this year.

"But within that $160 million, as I indicated before, there are three line items. One is salaries and wages, one is fixed assets, one is services and supplies. Now, literally within that authorization he can use those people any way he wants. So if he decided that he needed to do something at Las Colinas, he could do that.

"There are programs in his operation which are very important. There isn't anything, I think, that the Sheriff does that isn't important, but the SWAT operation and ASTREA [a helicopter patrol] are not required programs. And, historically, we have indicated to the Board that those programs are discretionary programs; and, seems to me that there is $3 to $5 million available in those programs.

"So, I guess the answer is while I'm not prepared to say that the Sheriff has money coming out of his ears—because no department does—he does have $160 million that he can spend with reasonable flexibility."

The Armstrong plaintiffs then presented testimony from two witnesses who had studied the county budget and who had suggestions of how expenditures could be differently made and how additional funds could possibly be raised. These witnesses were Steven Frates, director of a private taxpayers' organization, and Paul Rosen, a business consultant. The Board's attorney objected that these were surprise witnesses whose qualifications as experts were in question and whose assumptions in conducting their studies were suspect. The Board then called a rebuttal witness regarding the proposals that these expert witnesses had made (Mr. Lopez, the County's director of financial management).

Declarations presented during the contempt proceedings established that the population at LCDF had frequently exceeded the cap established by the consent decree from January 1993 through the conclusion of the hearing, with the number of prisoners over cap ranging from three to one hundred forty-nine. The LCDF population was expanding consistently by approximately 13 percent between 1991 and 1993.

After the contempt hearings began, the sheriff took several steps to reduce the prison population over cap at LCDF, including reinstating a work release program and shifting female inmates to a facility that had previously housed only males, after finding placements for the displaced male inmates. However, the sheriff had not taken steps to restrict misdemeanor bookings, nor implemented a pretrial electronic surveillance program, as allowed by prior court orders in the Armstrong matter.

At the close of testimony, the trial court received written argument by the Board and the Armstrong plaintiffs, and then issued an oral ruling in which the court found there was clear evidence that the defendants had an ability to comply with the consent decree, and had willfully disregarded that responsibility by electing to do otherwise. The court referred to evidence of funding that the County had received, such as Teeter funds, and discretionary expenditures by the sheriff, such as helicopter patrols and "SWAT"

teams. The court concluded, "I think the sheriff has passed the buck to the County and the County has passed the buck to the sheriff and the buck stops here. It's got to be done." The court explained that it found inapplicable the provision of the consent decree that the party defendants were not obligated to build new facilities or modify facilities, and referred to the existing nearby men's facility as something other than a new facility, such as the consent decree expressly excluded. Suggesting that circumstances might allow modification of the consent decree, the court concluded, "I think under the circumstances the intent of the order would have been to require the County and the sheriff to operate a facility which would suffice to stay within the cap."

As a remedy, the court stated that fines would be imposed of $20 per day per prisoner who exceeded the cap until the population were down to the 478 persons set by the consent decree. The fines were to be paid separately by the Board out of the County budget and by the sheriff out of the sheriff's budget, into an escrow fund which the court said could "be used exclusively for whatever needs to be done to establish the staffing and to reduce the Las Colinas over-the-cap housing down to the cap level." The court requested that the Armstrong plaintiffs' counsel prepare the order.

The written order issued by the court did not include many of the details discussed at the oral hearing. The operative portion of the order finds the sheriff and the Board guilty of contempt for failing to obey the consent decree "requiring that the daily population at the [LCDF] not exceed 478 inmates." The court found defendants knew of the order, had the ability to comply with it at all times relevant to the inquiry, yet willfully disobeyed its express terms. The fines imposed were specified to be used "for the sole purpose of maintaining the court-ordered population cap at [LCDF]."

Two months after the order was issued, the Board petitioned this court for a writ of review of the order adjudging contempt. We issued the writ to establish the record in this proceeding and heard oral argument. Payment of fines was stayed pending further order of this court.[4]

## DISCUSSION

In challenging the order of contempt, the Board assumes that the trial court expressly found that the Board's failure to fund a reopening of the men's facility constituted willful disobedience of the consent decree. As we

---

[4]Fines had been paid by the Board on some 10 occasions after the contempt order was issued.

will discuss, when the order and the contempt proceedings are strictly construed, no such express finding was made. The Board must be held to its obligations under the consent decree regarding operation of the jail facility only with regard to its proper role in that operation. Moreover, the Board persuasively argues that it did not willfully disobey the consent decree in carrying out its legislative functions in the manner that it did. To explain our conclusion that the contempt order against the Board must be annulled, we first set forth the applicable standard of review, and then discuss the scope of the jurisdiction that the trial court had to enforce the consent decree. This requires an examination of the record in light of the respective roles of the Board and the sheriff with regard to jail funding and operations, and the role of the courts in supervising institutional reform.

## I

### *Standard of Review*

■ "The facts essential to jurisdiction for a contempt proceeding are '(1) the making of the order; (2) knowledge of the order; (3) ability of the respondent to render compliance; (4) willful disobedience of the order.' [Citations.]" (*In re Liu, supra,* 273 Cal.App.2d at pp. 140-141, fn. omitted.) "The record of the court must affirmatively show upon its face the facts upon which jurisdiction depends so that an appellate court can determine if a contempt has been committed. [Citation.]" (*Id.* at p. 146.)

■ To review an adjudication of contempt, " 'the sole question before us is one of jurisdiction of the trial court to render the judgment under review, and in such a case the review of the evidence is limited to determining whether there was any substantial evidence to sustain the jurisdiction of the trial court.' [Citations.] More recently we said that 'the responsibility of the reviewing court is merely to ascretain [*sic*] whether there was sufficient evidence before the trial court to sustain the judgment and order. The power to weigh the evidence rests with the trial court.' [Citations.]" (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].)

Thus, in writ proceedings to review an adjudication of contempt, ". . . the question whether the acts constituted a contempt is jurisdictional, and in the absence of evidence showing contempt, the order of commitment should be annulled. [Citations.]" (*Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 409 [42 Cal.Rptr. 441, 398 P.2d 777]; Code Civ. Proc., § 1074 [providing that in writ of review proceedings, the appellate court determines whether the inferior tribunal has regularly pursued its authority].) In conducting this

review, the appellate court does not indulge in presumptions to sustain the regularity, validity, or sufficiency of the proceedings in support of the judgment, or the judgment itself, because of the quasi-criminal nature of contempt findings. (*In re Liu, supra*, 273 Cal.App.2d at p. 146.) The evidence need not be reviewed in favor of the accused, however, since the inquiry should be whether there was any substantial evidence before the trial court to sustain its jurisdiction. (*City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 517 [241 P.2d 243].)

Punishment for contempt "can only rest upon clear, intentional violation of a specific, narrowly drawn order. Specificity is an essential prerequisite of a contempt citation. [Citations, fn. omitted.]" (*Wilson* v. *Superior Court* (1987) 194 Cal.App.3d 1259, 1273 [240 Cal.Rptr. 131].) It is not proper for a contempt citation to rest on an order "which incorporates by reference the entire history of a complicated lawsuit." (*Id.* at p. 1272.) The precise court orders as written are what may be enforced, not any amplification of those orders by history of the litigation or documents incorporated by reference. (*Id.* at p. 1273; Code Civ. Proc., §§ 1209, 1218.)

In light of these rules, the authority the Board cites that a consent decree may be interpreted de novo by an appellate court is interesting but not applicable in these contempt proceedings. (*United States* v. *ITT Continental Baking Co.* (1975) 420 U.S. 223, 238 [43 L.Ed.2d 148, 162, 95 S.Ct. 926]; *Botefur* v. *City of Eagle Point, Or.* (9th Cir. 1993) 7 F.3d 152, 156.)[5] Moreover, we are required to review the terms of the order that the trial court issued, not the reasons given for the order. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; also see *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1 [270 Cal.Rptr. 326] [written order controls over oral pronouncement].) Thus, although the court gave extensive explanations of its analysis of the evidence in the case throughout the evidentiary proceedings and while issuing its oral ruling, we nevertheless strictly construe the contempt ruling and proceedings to determine whether the actual terms of the consent decree, i.e., its provisions regarding the population cap, were willfully disobeyed by the Board.

---

[5]Federal cases cited refer to an abuse of discretion standard of review of contempt findings, particularly in the jail crowding context. (See, e.g., *Stone* v. *City and County of San Francisco* (9th Cir. 1992) 968 F.2d 850, 856].) Although the California cases occasionally refer to an abuse of discretion standard with regard to contempt proceedings (see, e.g., *Uhler* v. *Superior Court* (1953) 117 Cal.App.2d 147, 156 [255 P.2d 29]), the California standard is normally stated as a substantial evidence review. (*In re Buckley, supra*, 10 Cal.3d at p. 247.)

## II

### *Scope of Jurisdiction to Enforce Consent Decree*

At the outset of this discussion it is appropriate to observe that the Board and the sheriff, by entering into the consent decree, necessarily gave up some discretion in performing their duties regarding jail operations, and have agreed that they may be bound by the commitment that the consent decree represents. (See *Wilson* v. *Superior Court, supra,* 194 Cal.App.3d at p. 1273.) It also should be taken as established that to comply with its statutory duties, as will be discussed below, the Board is required to provide a reasonable level of funding to enable the sheriff to carry out his duties. However, the plain language of the consent decree provides that the County, as represented by the Board, and the sheriff will not "operate" these detention facilities with prisoner populations in excess of the established facility-wide operational capacities, as defined in the agreement. What parts do the Board and the sheriff play in operating these detention facilities?

### A

### *Respective Roles of Board and Sheriff*

Penal Code section 4000 designates the sheriff as the keeper of the county jail. Penal Code section 4015, subdivision (a), deals with the duties of both the sheriff and the Board in this regard: "The sheriff shall receive all persons committed to jail by competent authority. *The board of supervisors shall provide the sheriff with necessary food, clothing, and bedding, for those prisoners,* which shall be of a quality and quantity at least equal to the minimum standards and requirements prescribed by the Board of Corrections for the feeding, clothing, and care of prisoners in all county, city and other local jails and detention facilities. Except as provided in Section 4016, the expenses thereof shall be paid out of the county treasury." (Italics added.)

Government Code section 26605 generally provides that the sheriff shall take charge of and keep the county jail and the prisoners in it, with specified exceptions not applicable here.

In addition to Penal Code section 4015, subdivision (a), quoted above, other statutes establish the duty of the board of supervisors to provide the sheriff with necessities for prisoners. Government Code section 29602 provides in pertinent part: "The expenses necessarily incurred in the support of persons charged with or convicted of a crime and committed to the county jail and the maintenance therein . . . are county charges. . . ." This section,

Government Code section 29602, is found in the overall financial provisions for counties, Government Code section 29000 et seq., defining the respective functions of county boards of supervisors, administrative officers, and county auditors. (Gov. Code, § 29001.)

Other pertinent sections regarding the Board's duty to provide jail facilities are Government Code section 25351, subdivision (a), providing for a board of supervisors' discretionary power to construct, expand, or repair public buildings, including jails, such as are necessary to carry out the work of the county government. Government Code section 25382 provides that a board of supervisors "may" construct, maintain, and staff jails in counties other than its home county.

In *Brandt* v. *Board of Supervisors* (1978) 84 Cal.App.3d 598 [147 Cal.Rptr. 468], the question presented was whether the county board of supervisors could be held responsible for substandard conditions in the county jail, without a showing it had failed to appropriate sufficient funds or otherwise refused to pay the costs for jail operations. The trial court had issued a writ of mandate against both the sheriff and the board of supervisors, although only the board appealed the writ. (*Brandt* v. *Board of Supervisors, supra*, 84 Cal.App.3d at p. 600.) The Court of Appeal reversed the trial court's ruling which required the board to comply with certain administrative provisions concerning the number and training of correctional officers in the county jail, finding no substantial evidence supported the determination that the board had breached its legal duties to provide adequate funding for jail operations. (*Id.* at pp. 602-603.) The court made the following observation: "Except in rare instances, the board of supervisors has no direct authority over the jail, and even where direct authority is given, its exercise is made discretionary by statute. The only clear and present duty enjoined by law upon a board of supervisors with regard to a county jail is to provide the sheriff with food, clothing, and bedding for prisoners (Pen. Code, § 4015) and to pay as a county charge other expenses incurred in the keeping of prisoners (Gov. Code, § 29602)." (*Brandt* v. *Board of Supervisors, supra*, 84 Cal.App.3d at p. 601-602, fn. omitted.)

In *County of Butte* v. *Superior Court* (1985) 176 Cal.App.3d 693, 698 [222 Cal.Rptr. 429], the court discussed the separation of powers principle with reference to a dispute between a county sheriff and board of supervisors over the board's reduction of funding to the sheriff's budget. The court found that the board had acted within the scope of its constitutional role by reducing the size of the sheriff's staff, in response to county budgetary limitations. The court explained its reasoning as follows: "The chaos that would result if each

agency of government were allowed to dictate to the legislative body the amount of money that should be appropriated to that agency, or its staffing and salary levels, is readily apparent. The budgetary process entails a complex balancing of public needs in many and varied areas with the finite financial resources available for distribution among those demands. It involves interdependent political, social and economic judgments which cannot be left to individual officers acting in isolation; rather, it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available." (*County of Butte* v. *Superior Court, supra,* 176 Cal.App.3d at p. 699.)

■ "In sum, the distinction to be drawn is between the power of a board of supervisors to appropriate county funds and the power of a sheriff . . . to manage the expenditure of the funds so appropriated." (77 Ops.Cal.Atty.Gen. 82, 88 (1994).)

B

*Role of the Court in Enforcing the Consent Decree*

Because the questions presented regarding the proper roles of the Board and the sheriff arise in the contempt context, it is necessary to examine the authority that has been developed regarding the appropriate judicial role in using mandatory remedies in supervising jail crowding litigation. ■ A first principle in this general area was established by the Supreme Court in *Myers* v. *English* (1858) 9 Cal. 341, 349: The judicial system does not interfere with the proper exercise of legislative discretion. In *Myers,* the Supreme Court denied a writ of mandate to compel the state treasurer to make certain salary payments, where the Legislature had not appropriated moneys to fund such payments. The Supreme Court stated: "It is within the legitimate power of the judiciary, to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of *non-action.* The Legislature being the creative element in the system, its action cannot be quickened by the other departments. Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation. There may arise exigencies, in the progress of human affairs, when the first moneys in the treasury would be required for more pressing emergencies, and when it would be absolutely necessary to delay the ordinary appropriations for salaries. We must trust to the good faith and integrity of all the departments. Power must be placed somewhere, and

confidence reposed in some one." (*Myers* v. *English, supra,* 9 Cal. at p. 349, original italics, disapproved in other part in *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 551, fn. 9 [174 Cal.Rptr. 841, 629 P.2d 935].)

In *Wilson* v. *Superior Court, supra,* 194 Cal.App.3d at page 1268, the court referred to the same subject matter: "It is well established as a matter of constitutional doctrine, basic to our form of government, that the judicial branch cannot directly and prospectively require a specific legislative act." The court in *Wilson* then drew a parallel between the separation of powers doctrine and the principle of federalism on which federal courts have relied in creating a limited role for federal courts in managing prison overcrowding litigation. (*Wilson, supra,* 194 Cal.App.3d at pp. 1268-1269.) Thus, the court in *Wilson* stated that ". . . the judicial role in monitoring institutional reform is extremely limited and is restricted to determining whether specific constitutional violations exist and fashioning narrow remedies to correct such violations. [Citations.]" (*Ibid.*)

Some federal cases, however, have not adhered closely to the approach of judicial restraint in prison reform litigation, and have shown little sympathy for governmental entities' claims that political difficulties impede timely and complete compliance with population caps in jail facilities. For example, in *Twelve John Does* v. *District of Columbia* (1988) 861 F.2d 295 [274 App.D.C. 62], the court of appeals upheld for the most part a number of district court orders upholding and enforcing a population cap established by a consent decree at a particular jail facility. Responding to the District of Columbia's arguments that political difficulties amounted to a lack of power on the municipality's part to comply with such court orders, the court stated, "Counsel would have this court accept some kind of schism between the District government and the District's prison system—as if there were two warring sovereignties to be recognized. Patently, the District government is viewed as an entity in this court, and its *inter se* problems cannot excuse the District's legal commitments." (*Id.* at pp. 299-300.) Similarly, in *Badgley* v. *Santacroce* (2d Cir. 1986) 800 F.2d 33, the court found that the county defendants, i.e., the sheriff, prison warden, and corrections officials of Nassau County in New York, were not justified in claiming it was impossible for them to comply with court orders due to political difficulties. (*Id.* at p. 37; also see *Palmigiano* v. *DiPrete* (D.R.I. 1989) 710 F.Supp. 875, 882-883 [where the governor and the director of the department of corrections were the defendants, rather than any legislative body].)

While this line of cases showing no sympathy for claims of impossibility of compliance with inmate population reduction orders, due to political

difficulties among the branches of government, has great intuitive appeal, we do not believe it should control here. These cases do not discuss in any detail separation of powers issues such as are squarely presented in the case before us. Moreover, we have no indication that the orders in those cases were framed in the same manner as the consent decree in this case, requiring jail operations at a particular level by agreement of the legislative body and the sheriff or executive branch. We therefore do not find governing these irate comments of federal judges, dismissing political difficulties as an excuse for noncompliance with orders, as they do not address the question actually presented here. More pertinent in the contempt context, we, believe, are the comments in *Wilson* v. *Superior Court, supra,* 194 Cal.App.3d at page 1268-1269, about the ideal limitations on the judicial role in monitoring institutional reform. (See p. 1741, *ante.*) ■ Also, as explained in *Uhler* v. *Superior Court, supra,* 117 Cal.App.2d at page 156: "While a court has inherent power to punish for contempt, this is a drastic remedy which should be used only when necessary to maintain law and order. It should rarely, if ever, be used for the purpose of settling differences of opinion between conscientious officials with respect to close questions of civil law."

Guided by all this authority, we turn to an examination of the record in this case to determine whether the Board had the ability to comply with the precise terms of the consent decree, and willfully disobeyed those terms, in such a manner as to constitute contempt.

## C

### *Analysis of the Record*

At the close of testimony, the trial court perceptively noted that it is most difficult to evaluate this testimony "regarding the ability to have the funds available to do something in this case, when you listen to the two sides of the story and to really know where they are, that there are really funds there. . . . [¶] I find that a really tough, tough area to analyze. It's pretty easy to listen to the Board's analysis that the Sheriff has enough to get by on, and the Sheriff's analysis that he doesn't." The court then requested closing argument on the issue of the availability of funds to the county treasury, and whether there were political decisions involved in the allocation of such funds.

The Board's witnesses, Supervisor Bilbray and Chief Administrative Officer Janssen, and its other witnesses unanimously testified that although the sheriff had a difficult job to do, he had been provided with sufficient funds by the Board to carry out all his responsibilities. The sheriff's testimony

essentially did not dispute this point, but sought to explain it: "[T]he statement on its face is true, but it does not deal with the practical realities of providing public safety services to this entire county of San Diego," said the sheriff at the hearing. Similarly, although the sheriff agreed that he has the discretion and the authority to transfer personnel and funds from other existing operations to the LCDF facility, he again explained: "Technically, that is correct. Realistically, pragmatically, it is impossible to do. Because it would place me into a position where I would have to decide, knowingly, that I would move money and personnel and staff from other facilities . . . ."

■ As a threshold determination, we do not find substantial evidence supports the trial court's finding that the Board willfully disobeyed the consent decree by failing to provide reasonable or adequate resources to enable the sheriff to do his job, however "technically" or "on its face" the evidence showed such adequacy of funding. This conclusion, we believe, is dictated by the authority setting forth the scope of the Board's authority with regard to jail operations: To provide the sheriff with food, clothing, and bedding for the prisoners and to pay other related expenses. (Pen. Code, § 4015, subd. (a); Gov. Code, § 29602.) The Board has not been given direct authority over jail operations, such as day-to-day compliance with a population cap. (See *Brandt* v. *Board of Supervisors*, *supra*, 84 Cal.App.3d at p. 601.) The evidence presented showed that the sheriff had a number of options which could be used to keep the LCDF population down below the cap level, and had used several of those options after the contempt proceedings were commenced: (a) work release and (b) transfer of females to another facility. Other available options which had not been used as of the time of the proceedings were (c) refusing to book any misdemeanant arrestees when the population at LCDF was over cap and (d) expanding the electronic surveillance program to accommodate pretrial detainees. The use of these options is within the sheriff's discretion, not the Board's.

In *Ruiz* v. *Estelle* (5th Cir. 1982) 679 F.2d 1115, 1148, a prison crowding case out of Texas, the federal court found it a desirable approach to undertake interim and conservative measures to reduce crowding, and if those measures did not work, to use additional ones. The court explained, "This 'wait and see' approach ensures that the intrusion into state processes will be no greater than that required to achieve compliance with the Constitution." (*Ibid.*) Here, too, in light of the consent decree's focus upon jail operations, the Board's duties under the consent decree must be narrowly construed to be consistent with the statutory and case law limitations upon the Board's proper role to fund and provide for the prison system, with equal

attention given to the sheriff's operational alternatives in administering that system. As explained in *Wilson* v. *Superior Court, supra,* 194 Cal.App.3d at pages 1272-1273, a contempt citation may not be based on an order "which incorporates by reference the entire history of a complicated lawsuit." (*Id.* at p. 1272.) Instead, the court orders as written are what may be enforced. (*Id.* at p. 1273.)

Therefore, as we have pointed out above, the contempt order itself does not require the Board to reopen a closed facility or to take other specific action to fund particular facilities in any particular manner, despite the discussion of such options at the hearings.[6] This was in accord with applicable law concerning the separation of powers principle and the legislative nature of funding decisions. (*County of Butte* v. *Superior Court, supra,* 176 Cal.App.3d at pp. 698-699; *Myers* v. *English, supra,* 9 Cal. at p. 349.) In accordance with this principle, the testimony presented by the Armstrong plaintiffs concerning suggested funding alternatives and potential other budgetary decisions than those actually made was not entitled to any weight, because such testimony was not addressed to any validly presented element of the alleged contempt, i.e., ability to comply with the decree or willful disobedience of it. The trial court did not, therefore, have substantial evidence to find the county had an ability to comply with the consent decree by carrying out more than its mandated duties under Penal Code section 4015, subdivision (a), and Government Code section 29602.

Moreover, the uncontroverted evidence showed that the sheriff was funded at least at minimally adequate levels to allow him to maintain the detention facility in question, as he had agreed to do in the consent decree. The amount of funding given the sheriff and its relative percentage to available county funds had increased during the relevant time period in this case. Given the acknowledged levels of funding and the authority of the sheriff to operate the jails and to flexibly utilize the funds provided him by the Board, we cannot say the evidence shows willful failure on the part of the Board to adequately fund the detention facility which is the subject of the consent decree. On a different record, however, where a board of supervisors has clearly failed to provide enough funding to enable the sheriff to carry out his duties, a contempt finding might be appropriate. (See *Wilson* v. *Superior Court, supra,* 194 Cal.App.3d at pp. 1273-1274.)

---

[6]Although the trial court referred at the hearing to modification of the consent decree by change of circumstances, that reasoning does not appear in the written order. We review the order that the trial court issued, not the reasons given for the order. (*Davey* v. *Southern Pacific Co., supra,* 116 Cal. at p. 329.)

## D

*Remaining Issues*

Because of our resolution of these issues, we need not decide the Board's constitutional challenge to the statutory defense or immunity provided against contempt proceedings to a public entity, in the event of its proven financial inability to comply with an order. (Code Civ. Proc., § 128, subd. (f).) Since the sheriff is not a petitioner in these review proceedings, we do not decide this statutory interpretation matter as to that official either. Nor is it necessary for us to address the Board's additional argument that it was deprived of due process when the court allowed two surprise expert witnesses to testify without sufficient notice to the Board.

Finally, in its petition, the Board has requested an order that fines it previously paid be immediately refunded. Such a remedy is proper since we annul the contempt order as against the Board. The remainder of the Board's objections to the fines imposed upon it, based on separation of powers concerns, have become moot.

The Board also, however, has raised the issue of the propriety of the fines imposed upon the nonpetitioner sheriff, contending that those fines payable out of the sheriff's budget ultimately penalize the County itself and thus constitute an intrusion on legislative discretion in allocation of funds. We are not sympathetic to that argument for several reasons: first, we doubt that the Board has standing to object to fines imposed upon the sheriff, since the sheriff was at all relevant times separately represented by counsel and has not joined in this petition for writ of review. Secondly, the sheriff is bound by the consent decree with regard to jail operations, an area clearly within his purview. Third, although Sheriff Roache lost the November 1994 election, the sheriff is actually named in the contempt order only in his official capacity, and it is not disputed that the Armstrong and Hudler orders apply to the sheriff and his department without regard to the individual who occupies the office of sheriff at any particular time. (See *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 905-909 [141 Cal.Rptr. 133, 569 P.2d 727] [a board of supervisors was bound by an injunctive order to which it was not a party since it was an agent of a party that was bound by the order].) The fines imposed up until the time we issued a stay remain enforceable against the sheriff's department. However, to the extent that any future fines may be imposed upon the department during Sheriff Kolender's tenure, it will be necessary for the Armstrong plaintiffs to obtain jurisdiction over Kolender by serving him in the Armstrong matter. (*Ex parte Tinkum* (1880) 54 Cal. 201, 203-204.)

## DISPOSITION

The petition for writ of review is granted as to the petitioner board of supervisors and the contempt order is vacated as to the Board. The superior court is directed to issue an order that the fines paid to date be returned to the Board. This disposition shall not affect the order of contempt with regard to the nonpetitioner sheriff. The stay is vacated upon this opinion becoming final. (Cal. Rules of Court, rule 24(a).) Each party shall bear its own costs.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied May 5, 1995.